UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

SHERMAN RIVERS,

                      Petitioner,

        -against-

JOSEPH T. SMITH, Superintendent, Shawangunk
Correctional Facility,

                      Respondent.
------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**13-CV-00549 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Sherman Rivers ("Petitioner," or "Rivers") brings this pro se Petition for a writ of habeas

corpus, pursuant to 28 U.S.C. § 2254, challenging his 2006 state conviction for arson in the

second degree. He asserts four claims: (1) that the prosecution's cross-examination regarding

criminal acts and convictions of individuals known to him but unrelated to the crime with which

he was charged denied him due process and a fair trial; (2) that he was deprived of a fair trial by

the court's interested-witness jury instruction; (3) ineffective assistance of counsel; and (4) actual

innocence. For the reasons set forth below, Rivers's Petition is DENIED.

**I.    BACKGROUND**

    **A.    Facts**

      In February 2001, Licelle Garrett ("Garrett") and her two children moved into an

apartment located at 86 Himrod Street in Brooklyn, New York ("86 Himrod"). (Trial Tr. (Aff. of

Jill Oziemblewski in Opp'n to Pet. for Writ of Habeas Corpus ("Oziemblewski Aff.") (Dkt. 10),

Ex. A (Dkt. 10-1)) at 220-21, 225.)[1] Rivers was the manager of the building, responsible for

collecting rent, paying bills associated with the building (such as mortgage payments), and

---

[1] Citations to page numbers of documents referenced in this opinion correspond to the page numbering assigned by
the court's electronic docketing system (ECF).

overseeing building maintenance. (Id. at 349.) Garrett paid approximately $450 per month for the apartment. (Id. at 223.) The small room she rented lacked windows and abutted the backyard of the apartment. (Id. at 222.) The door separating Garrett's apartment from the rest of the building did not have a lock, because Rivers had two dogs and wanted to be able to access the backyard. (Id. at 222-23.)

At trial, Garrett testified that the living conditions at the time she moved into 86 Himrod were "all right" (id. at 225), and that "it was livable for [her] and [her] children" (id. at 252). However, the conditions of Garrett's apartment deteriorated over the following months. As Garrett testified: "It was heat problems, electricity problems, roaches. Roaches was infested. We had to put tissue in our ears to make sure the roaches don't crawl in my ears or my kids' ears. It was mice here and there and electricity problems." (Id. at 226-27.) She further described that in the winter following her move, the apartment was without heat on three or four occasions, that the stove was completely non-functional, and that water from the toilet on the floor above leaked into her bathroom. (Id. at 227-28.) Garrett complained to Rivers about these problems, but Rivers did nothing to ameliorate the situation. (Id. at 228-29.)

In or around October 2001, Garrett's two children were diagnosed with lead poisoning. (Id. at 228-29; 250-51.) Garrett suspected that her children's illness stemmed from the conditions of the apartment (id. at 229), and she stopped paying rent because of this suspicion (id. at 228-29). Garrett relayed her concerns about the situation to Rivers, but he refused to correct the lead problem (or any of the other problems about which Garrett complained) until Garrett settled her arrears. (Id. at 228-29.) On one occasion, Rivers told Garrett to bring the lead poisoning issue to the attention of Elvis McKnight ("McKnight") (id. at 229), the owner of the building (id. at 345, 349), and the father of Rivers's then-girlfriend, Zakkyah McKnight (id.

2

at 350). Around this time, Rivers told McKnight that he wanted Garrett out of the building due to her failure to pay rent. (Id. at 354.)

After Garrett's children became sick with lead poisoning and her efforts to informally reconcile the situation with Rivers proved fruitless, she filed a claim against Rivers in landlord-tenant court. (Id. at 228-29.) However, Rivers never appeared, despite being served on several occasions. (Id. at 229-30.) As McKnight explained, Rivers told him that he and Garrett "had a conversation about the going to court and he's not going to court." (Id. at 356.)

Garrett's decision to withhold her rent led to an immediate escalation of her problems with Rivers. She explained at trial:

> Q: What happened, when you stopped paying rent to Sherman Rivers?
>
> A: He started treating me wrong. He started being rude and obnoxious. Every day he was just mad, calling me all kinds of names and harassing me.
>
> Q: What types of names?
>
> A: Bum bitch. You and your fucking kids is dirty. You dirty bum bitch. You kids are dirty. That's all he would say. Just change it around in different words.
>
> Q: How would he harass you?
>
> A: Because he would come upstairs, he lived in the basement, he would come upstairs to my floor, he wouldn't knock on my door or anything. He would just yell in the hallway, calling me all kinds of freeloading bum bitches. Walk to the front door, just talking out loud so I could hear him, but he wouldn't knock on my door.
>
> Q: Did he ever say what he would do to you, if you didn't pay the rent?
>
> A: One time he said: You keep trying to fucking play me I'm going to get somebody to pop you, if you don't want to pay your fucking rent.

(Id. at 232.) Rivers's hostility toward Garrett manifested itself in other ways, as well. On one occasion, Rivers turned off the electricity in Garrett's unit, temporarily forcing her to move her family into her sister's nearby apartment. (Id. at 234.) Garrett's sister instructed her to contact the police and return with them to 86 Himrod; when she did, she discovered that Rivers had also changed the lock to the front door. (Id.) Though Rivers eventually restored Garrett's electricity and provided her with a new key to the apartment, Garrett felt that ultimately the police involvement led to a further worsening of her relationship with Rivers. (Id. at 235.)

On November 1, 2001, Joseph Truglio ("Truglio"), an inspector from the New York City Department of Housing Preservation and Development ("HPD"), visited 86 Himrod. (Id. at 203-04.)[2] Truglio's investigation revealed that no corrective measures had been taken, despite Rivers's awareness of the numerous lead paint violations. (Id. at 206-07.) Truglio then assessed the scope of the efforts needed to fix the violations and estimated that the cost of repairs would be "in the thousands." (Id. at 207.)

The following day, November 2, 2001, Garrett left her apartment at approximately 8:00 a.m. to drop off her children at day care. (Id. at 238.) At some point thereafter, a fire broke out in Garrett's room. (Id. at 395.) Battalion Chief Anthony Devita ("Devita") of the New York City Fire Department ("FDNY") and approximately forty firefighters responded to the scene that

---

[2] HPD was referred to the case by Harry Zhou ("Zhou"), a Respiratory Protection Coordinator with the New York City Department of Health and Mental Hygiene. (Trial Tr. at 320-21.) The possibility of lead paint violations was initially referred to Zhou in April of 2000, when he made his initial visit to 86 Himrod to test for lead paint. (Id. at 321.) On that visit, Zhou determined that there were twenty-nine areas within 86 Himrod that tested positive for lead paint; the lead paint levels in Garrett's room were the highest that Zhou's instrumentation was capable of recording. (Id. at 322-23.) Zhou returned approximately a year later, on May 14, 2001, to conduct a reinspection, but he was denied entry by Rivers, who claimed to be the son-in-law of the building's landlord. (Id. at 325.) Zhou returned on May 24, 2001, and was able to gain entry into the building, where he found that only one of the twenty-nine areas in which he initially discovered lead paint had been corrected. (Id. at 325-26.) Zhou informed Rivers that Rivers was obligated to correct the violations, and that if he failed to do so, HPD would step in, correct the violations, and bill the landlord. (Id. at 326.) Rivers signed an Intervention Report, indicating that Zhou in fact visited the premises and conveyed the aforementioned message. (Id. at 326-27.) Zhou subsequently referred the matter to HPD, which assigned Truglio to investigate the situation. (Id. at 327-28.)

4

afternoon. (Id. at 394-97.) Devita and the rest of his battalion successfully extinguished the fire, and Devita subsequently entered the building to investigate the cause of the blaze. (Id. at 402-03.) Because Devita was unable to determine the cause, he submitted a "code 1041" to the Bureau of Fire Investigation, signaling that the fire was "suspicious or undetermined in nature." (Id. at 403.)

Kevin Dolan ("Dolan"), a New York City fire marshal, responded to Devita's code 1041 that same day. (Id. at 307.) At trial, Dolan testified about the different causes of fire he encountered in his work:

> Q:     Mr. Dolan, what are the different causes of fire?
>
> A:     You have your accidental fire.
>        You have your act of God, lightening fire.  Many natural
>        causes.
>        And then you have your nonaccidental fire.

(Id. at 306.) Following his investigation, Dolan determined that the fire had originated on top of the mattress in Garrett's bedroom and moved to the contents of the room. (Id. at 309-11.) He ruled out accidental causes because there were neither electrical outlets near the mattress, nor any evidence of careless smoking. (Id. at 311.) Likewise, Dolan ruled out natural causes, as there was no lightening or other "act of God" observed on the day of the fire. (Id.) Accordingly, Dolan reported that the fire was "nonaccidental." (Id.) At trial, Dolan testified that the fire could have been started by a lit cigar or cigarette placed against the mattress, and that, depending on the material of the mattress and the bedding, a fire set in such a manner could smolder for up to an hour or, alternatively, accelerate in about a minute. (Id. at 314.)

Garrett returned to 86 Himrod at approximately 4:45 p.m. to find the investigation in progress. (Id. at 238.) She immediately entered the building and made for the basement, where Rivers's room, among others, was located. (Id.) Unable to locate Rivers, Garrett instead

5

confronted another individual who lived in the building, Anthony Prescod ("Prescod"),

attempting to determine the cause of the fire which had destroyed her apartment. (Id. at 239.) At

that time, Rivers and his girlfriend emerged from Rivers's apartment; and Garrett immediately

confronted him about the fire. At trial, Garrett described the encounter:

> Q: Did you talk to [Rivers]?
>
> A: I just asked, when I seen him coming out of the room, I asked him why, I was crying, I said: Why did you do this to me? Why did you do this? And whole time he, he wouldn't look at me at all. He had his back turned. Only thing he said: I told you I was going to get you the fuck out. I told you.

(Id. at 239-40.) Rivers and his girlfriend then left the building and drove off in a car. (Id.

at 241.) Her former residence rendered uninhabitable, Garrett and her children were forced to

move into a Red Cross hotel, and later a homeless shelter. (Id. at 243.)

In January 2002, McKnight attempted to collect money for the fire damage from the

insurance company. (Id. at 360.) However, the insurance company explained that they had not

received any premium payments and therefore were not obligated to cover the fire damage. (Id.)

McKnight confronted Rivers, who was responsible for paying the insurance premiums out of the

rent he collected from tenants. (Id. at 361.) McKnight described this interaction at trial:

> Q: Did you go and confront Sherman Rivers, after you found [out that the premiums had not been payed]?
>
> A: Yes, I did. He told me he paid it. So I didn't pay it no mind. Found out it was not paid and things turned different because now what we going to do?
>
> Q: Did you tell him what you wanted to do?
>
> A: Yes. I told him I was going to call the fire department and find out exactly what happened. And he said: I just, I set the fire just to get that girl out of there. Fixed up everything. So don't worry about it.

6

(Id.) McKnight demanded that Rivers leave the building, and Rivers became angry, storming out while threatening to "burn the whole damn house down and neighborhood" and kill McKnight's entire family. (Id. at 362.) About a week later, McKnight called the police and notified them of the situation, but they took no action. (Id. at 362-63.)

Three years later, in November and December of 2004, the FDNY contacted the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") seeking ATF's assistance with a separate open arson case. (Id. at 276-77.) Robert Soukeris ("Soukeris"), an ATF agent, was assigned the matter. (Id. at 276.) The subject of the investigation was Sherman Rivers. (Id.) Prescod had agreed to cooperate with the investigation and wear a wire while engaging Rivers in conversation. (Id. at 277-78.) On January 14, 2005, at approximately 5:30 p.m., and in the vicinity of 1209 Broadway, Brooklyn ("1209 Broadway"), Soukeris fitted Prescod with a digital audio recorder and a transmitter. (Id. at 278.) The ATF set up a video surveillance van near 1209 Broadway, with a vantage point of that location. (Id. at 279.) Three individuals were observed inside 1209 Broadway and recorded from the surveillance van: Juan Alvarez (known and hereinafter referred to as "Miguel"), Franklin Brown (known and hereinafter referred to as "El Rahim"), and Rivers. (Id. at 280-81.) Prescod entered 1209 Broadway and began conversing with the three men. (Id. at 284.) Soukeris was able to simultaneously hear the men's conversation via the transmitter worn by Prescod. (Id. at 286.) The conversation began innocently enough, but soon moved to a discussion about a fire on Himrod Street. (Id. at 285.) When Prescod mentioned 86 Himrod, Rivers admitted that he had set Garrett's room on fire:

> Well, look, what I did was took a half a cigar and a cigarette and lit if first – know what I'm saying? And then set that shit ablaze, so when the arson people come, "Oh, a cigarette started the fire." You know what I'm saying? And I burnt that shit. They tore them

7

people shit up too. All that shit she bought, with all my rent money was all crushed up.

(Resp't's Appellate Br. (Oziemblewski Aff., Ex. C (Dkt. 10-2)), at 55.)

## B.    Trial Court Proceedings

Rivers was charged with Arson in the Second and Third Degrees by Kings County Indictment Number 663/2005, pursuant to N.Y. Penal Law §§ 150.15 and 150.10. (Oziemblewski Aff. ¶ 10.)

Rivers's jury trial began on March 22, 2006. (Trial Tr. at 2.) Rivers was represented by Jeff Adler, Esq. ("Adler"). (Id.) During pre-trial proceedings, the court issued a Molineux ruling forbidding the prosecution from introducing evidence of a past arson investigation in which Rivers was ultimately not charged, but in which he allegedly admitted his culpability to the prosecution's confidential informant, Prescod. (See generally Trial Tr. at 4-24.) See People v. Molineux, 61 N.E. 286 (N.Y. 1901). The court also ruled, pursuant to Molineux, that the prosecution would be permitted to introduce information related to Rivers's and Garrett's highly contentious landlord-tenant relationship. (Id.) Additionally, the court issued a Sandoval ruling permitting the prosecution, in the event that Rivers testified on his own behalf, to question him about a number of prior criminal convictions. (Id. at 35-36.) See People v. Sandoval, 314 N.E.2d 413 (N.Y. 1974).

At the outset of the trial, Adler raised objections to portions of the audio recording captured by Prescod on January 14, 2005, at 1209 Broadway, and to still photographs of individuals—namely, Miguel and El Rahim—whose presence at that encounter was captured on Soukeris's videotape. (Trial Tr. at 3-7.) The court denied Adler's request to have the audio

8

recording and photos excluded from trial, and indicated that it would make a ruling as to their relevance in the event of their subsequent introduction at trial. (Id. at 7.)[3]

Roxann Bolds (Garrett's sister), Truglio, Garrett, Soukeris, Dolan, Zhou, McKnight, and Devita testified for the prosecution. (Id. at 39 (Bolds), 202 (Truglio), 219 (Garrett), 274 (Soukeris), 302 (Dolan), 319 (Zhou), 341 (McKnight), 392 (Devita).) During Soukeris's testimony, the prosecution displayed the video and audio recordings made during the sting operation on January 14, 2005, as well as still photographs of Miguel and El Rahim captured on that video. (Id. at 279-90.) Adler objected to the still photographs, but the court allowed them into evidence. (Id. at 280.) Prior to McKnight's testimony, the parties agreed to stipulate to the following:

> [T]hat another person who was not a participant in the crime was present inside 86 Himrod Street at the time of the fire on November 2, 2001, and that the circumstances were such as to render the presence of such person inside the building a reasonable possibility.

(Id. at 341.)

Adler called Rivers as his sole witness. (Id. at 416.) In his testimony, Rivers conceded that he did, in fact, claim to Prescod that he intentionally started the fire at 86 Himrod, but argued that this was a fabrication designed to convince Prescod to pay him money he believed Prescod owed him. (Id. at 433-35.) On cross-examination, the prosecution questioned Rivers about prior criminal convictions and other bad acts of individuals whom Rivers knew, but who were not associated with the crime alleged. (Id. at 449-57.) Adler again made general objections to this line of questioning, but he was repeatedly overruled. (Id.)

---

[3] Both the video and audio recordings were eventually admitted into evidence as the prosecution's Exhibits Seven and Eight. (See Trial Tr. at 282 (video recording), 285 (audio recording).)

Following testimony, the court held a charge conference where it informed the parties of the jury charge it planned to give. (Id. at 529-30.) Adler did not object to the proposed charge. (Id.) Subsequently, on July 13, 2006, Adler and the prosecution gave their summations (id. at 537), and the court delivered the jury charge as planned (id. at 588). The portion of the jury charge at issue in the instant case is as follows:

> Now, the defendant testified in this case and I tell you that, as a matter of law, he is what we call an interested witness. That's because he has the primary interest in the outcome of this case. Whether any other witness has a sufficient emotional or economic interest in the outcome, to also be called an interested witness, is something for you to decide.
>
> Now, just because someone is an interested witness does not mean that this witness didn't tell you the truth; however, you must carefully consider the interests that a witness has in the outcome of the case in determining whether what the witness told you is the truth.

(Id. at 592-93.) Adler raised no objection to the charge. (Id. at 600.)

On July 13, 2006, the jury returned a verdict convicting Rivers of Arson in the Second Degree, see N.Y. Penal Law § 150.15, which was the only charge that had been submitted to them. (Trial Tr. at 529; 605-08.) On August 2, 2006, the state court found Rivers to be a second violent felony offender, see N.Y. Penal Law § 70.04, and sentenced him to a prison term of twenty-five years, with five years of post-release supervision. (Trial Tr. at 619-22.)

## C.    Direct Appeal

In August 2010, Rivers appealed his conviction to the New York Supreme Court Appellate Division, Second Department. Rivers was represented by Robert DiDio, Esq. (Def.'s Appellate Br. (Oziemblewski Aff., Ex. B (Dkt. 10-2)) at 1.) Rivers argued: (1) that he was denied due process and a fair trial by the prosecution's persistence in cross-examining him regarding criminal acts and convictions of persons whom he knew, but who were unrelated to the

case; (2) that the trial court's interested-witness jury instructions deprived him of a fair trial by unfairly singling him out, disparaging his credibility, and destroying his presumption of innocence; and (3) that the court's sentence of the maximum 25-year term was excessively harsh and should be substantially reduced. (Id. at 3-4.) On February 15, 2011, the Appellate Division affirmed Rivers's conviction. People v. Rivers, 916 N.Y.S.2d 828 (App. Div. 2011). The court concluded that Rivers's first claim was unpreserved for appellate review and noted that, in any event, any error arising from this claim was harmless due to the overwhelming evidence of Rivers's guilt. Id. The court reached the same conclusion in response to Rivers's second claim, regarding the jury charge. Id. Finally, the court held that "the sentence imposed was not excessive." Id. (internal citation omitted). On April 21, 2011, the New York Court of Appeals denied Rivers's motion for leave to appeal. People v. Rivers, 947 N.E.2d 1203 (N.Y. 2011).

### D.    Motion to Vacate Judgment

On February 27, 2012, Rivers filed a pro se motion in the Supreme Court, Kings County, to vacate his judgment of conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10(1)(h), on the ground that he was denied the effective assistance of trial counsel under both the New York State and Federal Constitutions. (Def.'s Mot. to Vacate J. (Oziemblewski Aff., Ex. F (Dkt. 10-3)) at 18-33.) Rivers alleged that his trial counsel, Adler, failed and/or refused to: (1) consult or call an expert witness; (2) interview and call named witnesses; (3) offer a bank receipt as alibi evidence; (4) challenge the legality and validity of the prosecution's Exhibits Seven and Eight, the video tape and audio recordings; and (5) decline or reject the prosecution's proposed stipulation. (Id. at 22-29.) In addition to the ineffective assistance of counsel claim, Rivers also asserted a claim of actual innocence. (Id. at 33-36.)

11

On June 14, 2012, the Supreme Court, Kings County, denied Rivers's motion. (Decision & Order (Oziemblewski Aff., Ex. I (Dkt. 10-3)) at 101-02.) The court concluded that: (1) both Rivers's ineffective assistance of counsel claim and his actual innocence claim were procedurally barred under CPL 440.10(2)(c); (2) in any event, Rivers's ineffective assistance of counsel claims were "absurd," and he had failed "to meet the heavy burden he bears to establish his counsel was ineffective"; and (3) Rivers's actual innocence claim was "unsupported by any evidence." (Id.) On December 28, 2012, the Appellate Division, Second Department, denied Rivers's leave to appeal. (Decision & Order on Appl. (Oziemblewski Aff., Ex. L (Dkt.10-4)) at 28.)

E.    Petition for Writ of Habeas Corpus

On January 21, 2013, Rivers submitted the instant Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Pet. for Writ of Habeas Corpus ("Pet.") (Dkt. 1).) Rivers asserts four claims: (1) that he was denied due process and a fair trial because the trial court permitted cross-examination regarding prior criminal convictions and bad acts of persons whom he knew, but who were unrelated to the crime with which he was charged; (2) that he was deprived of a fair trial by the court's interested-witness jury instruction; (3) that he received ineffective assistance of trial counsel; and (4) actual innocence. (Id.) Respondent submitted an affidavit in opposition to the Petition. (Oziemblewski Aff.) Subsequently, on April 28, 2014, Rivers sent a letter to the court seeking a remand to the state trial court (Pet'r's Ltr.-Br. ("Pet'r's Ltr.") (Dkt. 14)), so that he might raise a freestanding "actual innocence" claim, citing a recent decision by the Second Department of the New York State Supreme Court, Appellate Division, People v. Hamilton, 979 N.Y.S.2d 97 (App. Div. 2014), which, according to Rivers, recognized such a claim under the New York State Constitution (Pet'r's Ltr. at 1). Respondent submitted a letter in

12

response, arguing that: (1) the Hamilton decision, decided by a state appellate court, has no bearing on the court's resolution of the instant case; (2) in any event, Rivers already raised a claim of actual innocence in his motion to vacate the judgment, and the claim was summarily rejected on the merits based on Rivers's "overwhelming guilt"; and (3) the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), foreclosed the propriety of remand. (Resp't's Ltr.-Br. (Dkt. 15).)

## II.     Habeas Corpus Standards

Under 28 U.S.C. § 2254(a), a district court is empowered to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A person must generally meet three requirements to obtain habeas relief under § 2254(a): (1) exhaustion of state court remedies; (2) lack of a procedural bar; and (3) satisfaction of the deferential standard of review set forth by the AEDPA. See, e.g., Pearson v. Rock, No. 12-CV-3505 (NGG) (LB), 2015 WL 4509610, at *5 (E.D.N.Y. Jul. 24, 2015).

### A.     Exhaustion of State Remedies

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1). "The exhaustion requirement is not satisfied unless the federal claim has been fairly presented to the state courts, [meaning that the petitioner] informed the state court of both the factual and the legal premises of the claim he asserts." Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191 (2d Cir. 1982) (en banc) (internal quotation marks and citation omitted).

"A petitioner is not required to cite 'book and verse on the federal constitution' in order for a claim to be 'fairly presented.'" Allison v. Khahaifa, No. 10-CV-3453 (KAM), 2011 WL 3298876, at *6 (E.D.N.Y Aug. 1, 2011) (quoting Picard v. Connor, 404 U.S. 270, 278, 275, (1971)). "Instead, exhaustion may be satisfied where the legal basis of a claim made in state court is the 'substantial equivalent' of the habeas claim." Id. (quoting Picard, 404 U.S. at 278). "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." Daye, 696 F.2d at 192. Thus, even if a petitioner does not cite any federal constitutional provisions, he may fairly present his federal claim to the state court through:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like factual situations, (c) assertion of the claim in terms so particular as to call in mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Id. at 194.

Notably, every claim that a petitioner makes in his § 2254 application must first have been raised in state court in order for the petition to be considered exhausted. This "total exhaustion" rule requires that "a district court [ ] dismiss habeas petitions containing both unexhausted and exhausted claims." Rose v. Lundy, 455 U.S. 509, 513, 522 (1982). But there is an important exception to the total exhaustion rule—created by a 1996 amendment to AEDPA— whereby a district court may deny an entire habeas petition on the merits notwithstanding a petitioner's failure to exhaust some or all of his claims. See 28 U.S.C. § 2254(b)(2). In other words, a court may deny but not grant "mixed petitions" on the merits. Caswell v. Racetti, No. 11-CV-0153 (MAT), 2012 WL 1029457, at *4 (W.D.N.Y. Mar. 26, 2012) (citing Turner v. Artuz, 262 F.3d 118, 122 (2d Cir. 2001)).

14

### B.   Procedural Bar

"It is well established that federal courts will not review questions of federal law presented in a habeas petition application when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." Cone v. Bell, 556 U.S. 449, 465 (2009) (internal quotation marks and citation omitted). "[W]hen a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review."[4] Id. However, "[t]he adequacy of state procedural bars to the assertion of federal questions is not within the State's prerogative finally to decide; rather, adequacy is itself a federal question." Id. (internal quotation marks and alteration omitted).   Thus, courts "have an independent duty to scrutinize the application of state rules that bar [its] review of federal claims." Id. at 468.

The concepts of procedural bar and exhaustion often interact in an important way.   If a § 2254 petitioner has failed to present a claim to a state court but can no longer do so—for example, if the time to file a state court appeal has passed—then that claim is considered procedurally barred rather than unexhausted.   See O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999) (holding that petitioner's "failure to present three of his federal habeas claims to the Illinois Supreme Court [ ] resulted in a procedural default of those claims"); Lloyd v. Walker, 771 F. Supp. 570, 574 (E.D.N.Y. 1991) (noting that "[w]hen a petitioner has not properly presented his claim to a state for consideration on the merits, but it is clear that the state court would hold the claim procedurally barred . . . the exhaustion requirement is satisfied" but the petitioner is barred "from litigating the merits of th[at] claim[] in federal habeas

---

[4] As an exception, a court may consider a procedurally barred claim on the merits if the prisoner demonstrates: (1) "cause" for failing to comply with the state procedural rule; and (2) "prejudice" from the procedural bar. Wainwright v. Sykes, 433 U.S. 72, 92 (1977).

15

proceedings"). A court's conclusion that a claim is procedurally defaulted rather than exhausted

permits the petitioner to avoid the harsh effects of the total exhaustion rule discussed above—

that is, if a claim has not been presented to the state court but can no longer be brought in state

court, the court may consider the petitioner's remaining claims on the merits so long as those

claims have been exhausted. See Turner, 262 F.3d at 122-23.

### C.    AEDPA Deference

Where a state court reached the merits of a claim asserted in a § 2254 habeas petition, the

state's merits decision is reviewed under the deferential standard set forth in AEDPA. AEDPA

provides that:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim—(1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or (2)
> resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); see also Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the

Supreme Court's decisions as of the time of the relevant state-court decision." Howard v.

Walker, 406 F.3d 114, 122 (2d Cir. 2005). A state court decision is "contrary to" clearly

established federal law "if the state court arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides a case differently than [the

Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529

U.S. 362, 413 (2000). A state court decision is an "unreasonable application" of clearly

established federal law "if the state court identifies the correct governing legal principle from

[the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. The question is "not whether the state court was incorrect or erroneous in rejecting petitioner's claim, but whether it was objectively unreasonable in doing so." Ryan, 303 F.3d at 245 (internal quotation marks, alterations, and emphases omitted). The petition may be granted only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011).

Under AEDPA, "a determination of a factual issue made by a State court [is] presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

III.    Discussion

A.    **Denial of Due Process and a Fair Trial Based on Improper Evidentiary Allowances by the Trial Court**

Rivers argues, as he did on direct appeal, that he was denied due process and a fair trial because of the evidentiary allowances made by the trial court. (Pet. at 4.) Specifically, Rivers points to the trial court's decision to allow the prosecution to cross-examine him "regarding criminal acts and convictions of persons known to [him] but unrelated to [the instant case]." (Id.) The Appellate Division held that this claim was both procedurally barred and without merit. Rivers, 916 N.Y.S.2d at 828. The court finds that Rivers's claim was not procedurally barred, but that the state court's adjudication of the claim on the merits was neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, the claim does not warrant habeas relief.

17

1.    Procedural Bar

In ruling on Rivers's direct appeal, the Appellate Division concluded that Rivers's claim "that he was deprived of a fair trial as a result of the prosecutor's improper cross-examination of the defendant is unpreserved for appellate review." Id. (citing C.P.L. § 470.05[2]). As noted above, see supra Part II. B, this court has "an independent duty to scrutinize" whether the state court's decision is an adequate procedural bar to the assertion of Rivers's claim. See Cone, 556 U.S. at 465. Although it is close question, ultimately the court finds that Rivers's claim was not procedurally barred.

C.P.L. § 470.05[2]—known as the "contemporaneous objection rule"—preserves for appellate review only those questions of law as to which "a protest . . . was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." C.P.L. § 470.05[2]; see Harripersaud v. Barkley, No. 04-CV-4035 (NGG) (KAM), 2006 WL 467951, at *8 (E.D.N.Y. Feb. 27, 2006). The contemporaneous objection rule "is a firmly established and regularly followed New York procedural rule" that "constitutes an independent and adequate state law ground." Downs v. Lape, 657 F.3d 97, 102 (2d Cir. 2011).

A defendant can successfully register a protest by making timely objections which are sufficiently specific as to indicate the particular constitutional ground on which the objection is based. See Johnson v. Conway, No. 04-CV-3915 (SLT), 2005 WL 1220933, at *6 (E.D.N.Y. May 20, 2005). Here, specificity is key; the overwhelming weight of New York case law indicates that a "general objection"—such as stating "I object" without further explanation—is not enough. Id. (collecting cases discussing general versus specific objection distinction). Alternatively, if a defendant's objections are sustained, the defendant can preserve the objection

18

for appellate review by requesting a curative instruction. Harripersaud, 2006 WL 467951, at *10-11. However, in that instance the defendant must further specifically object to the curative instruction, lest the record incorrectly suggest the defendant's satisfaction with the court's response to his objection. See, e.g., Azaz v. Artus, No. 09-CV-03857 (KAM) (SMG), 2012 WL 5289519, at *6 (E.D.N.Y. Oct. 19, 2012) ("Federal courts have consistently barred habeas claims where the trial court issued curative instructions and petitioner failed to seek further relief."). Finally, a defendant can avoid the forfeiture of claims wrought by the contemporaneous objection rule by moving for a mistrial; however, "a motion for a mistrial . . . must be made at the time of the impropriety and a belated motion which does not give the trial court opportunity to remedy the error complained of will fail to preserve the issue." People v. Bruen, 523 N.Y.S.2d 883, 884 (App. Div. 1988); see also Johnson, 2005 WL 1220933, at *7 (defense counsel's motion for a mistrial, which came after the close of summations and after the court had read the jury charge, was not contemporaneous); Madore v. Beaver, 368 F. Supp. 2d 219, 223 (W.D.N.Y. 2005) (affirming procedural bar because "defense counsel did not contemporaneously object to the prosecutor's comment, and he did not request a mistrial until after summations were completed"). In New York, moreover, the motion for mistrial must be based on the specific grounds asserted on appeal. People v. Philips, 992 N.Y.S.2d 104, 106 (App. Div. 2014); People v. Martin, 983 N.Y.S.2d 813 (App. Div. 2014) (Mem.); James v. Walker, No. 99-CV-6191 (JBW), 2003 WL 22952861, at *7 (E.D.N.Y. Aug. 28, 2003).

Rivers's claim is based on the following five statements made or elicited by the prosecutor during his cross-examination of the defendant. (See generally Pet'r's Ltr. at 18-20.)

(1) Regarding an individual known as Shaka, the prosecution elicited testimony from Rivers that Shaka was his cousin (Trial Tr. at 449), and that Rivers was aware that Shaka was

19

incarcerated in Virginia for drug trafficking (id.). Adler generally objected and was overruled. (Id. at 449-50.)

(2) Regarding El Rahim, the prosecutor elicited testimony from Rivers that he was his cousin (id. at 451-52), and had Rivers identify his photograph (id. at 452-53). The prosecution later asked if Rivers knew that El Rahim was on probation and had prior convictions for theft on his record. (Id. at 456.) Over Adler's general objections, which the court overruled, Rivers answered both questions in the affirmative.

(3) Regarding Miguel, the prosecutor elicited that he was Rivers's friend and associate. (Id. at 451-52.) Over Adler's general objection, which was overruled, the prosecutor had Rivers identify Miguel's photograph. (Id. at 453.) The prosecutor asked whether Miguel had dealt drugs in the past; Adler again made a general objection but was overruled. (Id.) Nevertheless, Rivers denied knowledge of this. (Id.) The prosecution, again over Adler's overruled general objection, asked whether, on the night of January 14, 2005, Miguel briefly left the conversation and 1209 Broadway to go purchase drugs. (Id. at 454.) Rivers disclaimed knowledge of whether this occurred. (Id.)

(4) Regarding an individual known as "Poppa," the prosecution asked if Rivers knew him, and whether Rivers knew that he was a drug dealer. (Id. at 454.) Adler's general objections were overruled. (Id. at 454-55.) Rivers admitted to knowing Poppa but disclaimed knowledge that he dealt drugs. (Id.)

(5) Regarding Prescod, the confidential informant, the prosecutor inquired about Rivers's relationship with him, and whether Rivers was aware of Prescod's own prior criminal convictions and bad acts. (Id. at 456-459.) Over Adler's general objection, which was

overruled, Rivers described Prescod as "an associate" (id. at 457), and he disclaimed

knowledge of Prescod's prior convictions and bad acts (id. at 459).

Following the conclusion of cross-examination, but prior to the charge conference, summations,

and jury instruction, Adler expanded on the basis for his general objections and moved for a

mistrial. His comments, in pertinent part, were as follows:

> First, during the course of Mr. Rivers' testimony there were a
> number of questions and answers to which I objected that you
> actually overruled my objection dealing with criminal records and
> drug involvement of people associated with Mr. Rivers,
> including . . . [El Rahim and] Miguel. And there were numerous
> questions about them buying drugs and criminal records which, to
> my thinking, only serves to create a guilt by association inference
> for the jurors to draw. Didn't see there was anything really
> relevant or probative about that to allow the DA to repeat it many
> times, to ask questions about that after at first establishing my
> client's connections to those people. And I just thought it went
> way beyond what was appropriate. And many of the objections, as
> I said, were overruled, allowing that to stand . . . My problem is the
> overall effect of all these questions, including those questions
> overruled, as well as ones that were sustained, just creates a
> tremendous amount of prejudice to my client, to the point I feel, I
> respectfully, need to move for mistrial. That's what I'm doing
> now.

(Id. at 523-25.) The court denied the motion, explaining in pertinent part:

> First of all, questioning about drug involvement and criminal
> involvement of some of the individuals described by the defendant
> as his associates, I think was proper . . . . The relevance of the
> questioning that I allowed, was apparent to me, in that the issue
> was a comfort zone that the defendant had in talking about the
> arson in this case and about people who he described as associates,
> as to whether or not he'd really tell them truth about something or
> lie about something. And the fact that he was aware of their
> background and that they, too, had engaged in illegal activities,
> would be relevant on the issue of his admitting that he committed a
> crime. So I think it's relevant on that ground.

(Id. at 525-26.)

The Appellate Division found that Adler failed to comply with New York's contemporaneous objection rule, thereby rendering Rivers's claim, based on the exchanges listed above, unpreserved for appellate review. While Adler did, in fact, make only general objections to the prosecutor's questions challenged here—which by itself would render this claim procedurally barred—Adler also made a timely motion for mistrial where he specified the ground asserted on appeal. Accordingly, Adler's motion for mistrial is sufficient to warrant consideration of Rivers's claim on the merits. See, e.g., Liriano v. Burge, No. 07-CV-2092 (DLI) (JMA), 2010 WL 3924532, at *5 (E.D.N.Y. Sep. 29, 2010) (finding petitioner's motion for mistrial timely); Caston v. Costello, 74 F. Supp. 2d 262, 268-69 (E.D.N.Y. 1999) (finding that a motion for mistrial, brought prior to any instances rendering the asserted error "less susceptible to correction," was timely); People v. Scott, 516 N.E.2d 1208, 1211 (N.Y. 1987).

    2.    <u>Merits</u>

In addition to finding Rivers's claim procedurally barred, the Appellate Division rejected Rivers's claim on the merits, holding that "[i]n any event, any error arising from the prosecutor's cross-examination of the defendant was harmless, as there was overwhelming evidence of the defendant's guilt, and there is no significant probability that any impropriety in the prosecutor's cross-examination of the defendant affected the verdict." Rivers, 916 N.Y.S.2d at 828 (internal citations omitted).[5] The court agrees.

---

[5] "[F]ederal habeas review is generally foreclosed when a petitioner's claim is barred by a state procedural rule which is "independent of [a] federal question and adequate to support the judgment." Gomez v. Brown, 655 F. Supp. 2d 332, 343 (S.D.N.Y. 2009) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). "This doctrine applies even where the state court issues an alternative holding addressing the procedurally defaulted claim on the merits." Lora v. West, No. 04-CV-1902 (RJH) (GWG), 2005 WL 372295, at *6 (S.D.N.Y. Feb. 17, 2005); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding . . . [allowing] a state court [to] reach a federal question without sacrificing its interests in finality, federalism, and comity.").

As a threshold matter, evidentiary rulings of a state trial court generally do not present constitutional issues cognizable in a federal habeas proceeding, unless the defendant can show that the alleged error of state law was so pervasive as to have violated due process, such as by denying him or her a fair trial. See, e.g., Smith v. Lee, No. 12-CV-6215 (PGG) (HBP), 2015 WL 5011422, at *9 (S.D.N.Y. Aug. 24, 2015) ("State court rulings on evidentiary matters generally implicate only state law and 'are not reviewable by a habeas court unless the errors alleged are so prejudicial as to constitute fundamental unfairness.'") (quoting Warren v. Miller, 78 F. Supp. 2d 120, 135 (E.D.N.Y. 2000)); Huber v. Schriver, 140 F. Supp. 2d 265, 280 (E.D.N.Y. 2001) (adopting report and recommendation in full) ("Even erroneous state evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of habeas relief.").

To warrant habeas review, the evidence of which admission at the state trial court was allegedly in error must be "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it,' and the materiality of the evidence must be assessed in light of the entire record." Bonton v. Ercole, No. 08-CV-526 (ARR), 2008 WL 3851938, at *16 (E.D.N.Y. Aug. 18, 2008) (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)).

None of the above-mentioned statements were sufficiently material to provide the basis for conviction, nor were they solely responsible for removing a reasonable doubt that would have existed on the record had they not been allowed. First, no statement constitutes direct testimony of Rivers's actual involvement in uncharged crimes, or any other criminal activity. Instead, Rivers's contention is that the challenged statements merely implied that Rivers was involved in other criminal conduct, and were elicited in an attempt to establish the prosecution's "twin

23

themes of guilt by association and criminal propensity." (Def.'s Appellate Br. at 29.) "Implications, however, do not generally amount to evidence and therefore the . . . testimony [is] insufficient to constitute a ground for habeas relief." Bonton, 2008 WL 3851938, at *16, quoting Roldan v. Artuz, 78 F. Supp. 2d 260, 280 (S.D.N.Y. 2000).

Moreover, the allowances were non-prejudicial under both New York and federal evidentiary rules. New York "parallel[s] federal law . . . allow[ing] for admission of evidence regarding prior bad acts and/or uncharged crimes where it is relevant to an issue other than a defendant's propensity to commit the act or crime." Feliciano v. Berbary, No. 03-CV-4832 (NRB), 2003 WL 22832638, at *3 (S.D.N.Y. Nov 25, 2003). Likewise, "Federal Rule of Evidence 404(b) specifically permits the introduction of such evidence when its purpose is to prove, inter alia, motive, opportunity, and intent, but not 'the character of a person in order to show action in conformity therewith.'" Dann v. Rabideau, No. 905-CV-0969 (LEK) (RFT), 2008 WL 2704900 (quoting Fed. R. Evid. 404(b).).

A key component of the prosecution's case was the recording of Rivers's alleged confession to Prescod, Miguel, and El Rahim. The trial court permitted the prosecution to cross-examine Rivers about his relationship with these individuals, as well as his knowledge of their past crimes, in order to establish Rivers's comfort in confessing his own criminal acts. Thus, the allowance was not made to demonstrate Rivers's propensity to commit crimes. See, e.g., Bonton, 2008 WL 3851938, at *16-17 (holding that admission of testimony relating to the petitioner's relationship with a witness at trial was properly introduced to evince the petitioner's comfort in disclosing his criminal acts to the witness, who had a criminal record); Kavazanjian v. Breslin, No. 05-CV-5041 (FB) (SG), 2006 WL 3717100, at *3-4 (E.D.N.Y. Dec. 15, 2006) (trial court's allowance of prosecutor's questions regarding criminal backgrounds of witnesses, as well

24

as the criminal background of the defendant, was proper); DeVino v. Duncan, No. 01-CV-9044 (DLC), 2004 WL 884961, at *4-5 (S.D.N.Y. Apr. 23, 2004) (holding that the admission of testimony relating to the criminal activity that connected the defendant and the witness to whom the defendant confessed was not a constitutional violation); People v. Vega, 805 N.Y.S.2d 642, 643 (App. Div. 2005) (evidence of drug-related activities properly admitted to provide the jury with a thorough understanding of defendant's relationship with the prosecution's witnesses, particularly as to why defendant would speak freely to those witnesses about having committed the murder); People v. Sime, 687 N.Y.S.2d 78, 79 (App. Div. 1998) ("Uncharged crime evidence jointly involving defendant and a People's witness was properly admitted to explain the nature of their relationship so as to account for defendant's sharing of highly incriminating information with the witness."); People v. Devino, 688 N.Y.S.2d 114, 114 (App. Div. 1998) (evidence of drug crimes properly admitted to explain why defendant would speak freely with prosecution's witnesses about having committed two murders).

"Finally, to the extent that any prejudice may have resulted from these statements it was sufficiently cured by the trial judge's instructions to the jury, which this court 'must presume the jury followed.'" Bonton, 2008 WL 3851938, at *17 (quoting Herring v. Meachum, 378 (2d Cir. 1993)). First, the trial court instructed the jurors to reach a determination "solely on the evidence that you have heard at this trial," and that they should not "try to play detective" by speculating on what may or may not have happened. (Trial Tr. at 589.) Second, the court instructed that "the fact that [Rivers] has been convicted of a crime is not a factor that you may use in considering whether he committed the crime charged here." (Id. at 593.) These instructions undermine Rivers's contention that the jury drew impermissible inferences about him due to the prosecutor's challenged statements.

In sum, the court holds that none of the challenged statements provide a basis for habeas relief, as the trial court's decision to allow them was not an unreasonable application of clearly established federal law.

**B.     Denial of Fair Trial Based on Prejudicial Jury Instruction**

Rivers next claims that he was denied a fair trial by the trial court's allegedly unbalanced interested witness charge.[6]  In his brief to the Appellate Division, Rivers claimed that the trial court's instruction "was erroneous in that it informed the jury that the trial court had already determined that the defendant was less worthy of belief than other witnesses, and it implied that [defendant's] testimony was false, or at least far less credible than the testimony of other witnesses." (Def.'s Appellate Br. at 36.)  The Appellate Division held that Rivers's claim was both procedurally barred and without merit.  Rivers, 916 N.Y.S.2d at 858.  This court agrees with both conclusions.  Accordingly, Rivers's claim does not warrant federal habeas relief.

1.     Procedural Bar

In ruling on Rivers's direct appeal, the Appellate Division concluded that "[t]he defendant's contention regarding the trial court's charge to the jury concerning his status as an interested witness is . . . unpreserved for appellate review." Id. (citing C.P.L. § 470.05[2]) (internal citations omitted).  As stated above, the contemporaneous objection rule "requires that a party claiming error alert the trial court to the specific claimed error at a time when the court has an opportunity to cure any defects." Johnson v. Girdich, No. 02-CV-6118, 2003 WL 22953074, at *14 (E.D.N.Y. Oct. 15, 2003).  The contemporaneous objection rule provided an adequate and independent ground in state law for the Appellate Division's rejection of Rivers's jury charge claim.  See, e.g., Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); Washington v.

---

[6] For the specific text of the jury charge, see Part I.B., supra.

LeFevre, 637 F. Supp. 1175, 1177 n.4 (E.D.N.Y. 1986) (defendant waived right to appeal by failing to comply with contemporaneous objection rule).

At trial, Adler failed to voice any objection to the trial court's interested witness instructions at either the charge conference when the court announced that it would give an interested witness charge (Trial Tr. at 530), or when the court asked whether there were any objections to the charge as given (id. at 600). The Appellate Division found that, under these circumstances, Rivers failed to preserve the issue for appellate review. Rivers, 916 N.Y.S.2d at 828.

Absent a showing of cause for the procedural default and prejudice or a fundamental miscarriage of justice arising from the Appellate Division's ruling, Rivers's claim of trial court error is procedurally barred from this court's review. See Johnson, 2003 WL 22953074, at *14; Coleman v. Thompson, 501 U.S. 722, 750 (1991); Epps v. Comm'r of Corr. Servs., 13 F.3d 616, 617-18 n.1 (2d Cir. 1994); Velasquez, 898 F.2d at 9. To establish cause for a procedural default, a petitioner must "show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." McCleskey v. Zant, 499 U.S. 467, 493 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). If cause is established, the defendant must also establish prejudice by "demonstrating that there is a 'reasonable probability' that, but for the constitutional violation that is the subject of the defaulted claim, the outcome of the relevant proceeding would have been different." Gomez v. Brown, 655 F. Supp. 2d 332, 344 (S.D.N.Y. 2009) (quoting Strickler v. Greene, 527 U.S. 263, 289 (1999)). Alternatively, a defendant can show that failure to consider a defaulted claim would result in a fundamental miscarriage of justice, which occurs when "a constitutional

27

violation has probably resulted in the conviction of one who is actually innocent." Murray, 477

U.S. at 496.

Here, Rivers has not alleged, much less established, cause attendant to his procedural

default, or prejudice or a fundamental miscarriage of justice arising therefrom.[7]  Hence, the

procedural bar cited by the Appellate Division still applies, and Rivers is not entitled to federal

habeas corpus review on this ground.  See Epps, 13 F.3d at 617-18 n.1.

       2.    Merits

Although the Appellate Division properly held that Rivers's claim regarding the jury

charge was procedurally barred pursuant to an adequate and independent state ground, they went

on to conclude that "[i]n any event, any error was harmless."  Rivers, 916 N.Y.S.2d at 828.[8]  The

court agrees.

As a preliminary matter, alleged improprieties in a state trial court's jury instructions do

not ordinarily raise a federal constitutional question apt for review in a habeas proceeding.  See

Cook v. Pearlman, 212 F. Supp. 2d 258, 264 (S.D.N.Y. 2002) ("It is well-settled that '[e]rrors in

jury instructions normally implicate only State law.'") (quoting McCaskell v. Keane, No. 97-

CV-2999 (RPP), 2001 WL 840331, at *10 (S.D.N.Y. July 26, 2001)).  As the Supreme Court has

explained,

> Before a federal court may overturn a conviction resulting from a
> state trial in which this instruction was used, it must be established
> not merely that the instruction is undesirable, erroneous, or even
> 'universally condemned,' but that it violated some right which was
> guaranteed to the defendant by the Fourteenth Amendment.  The
> question is not whether the trial court failed to isolate and cure a

---

[7] Indeed, the brief that Rivers submitted in support of this claim is identical to that which he submitted to the
Appellate Division; accordingly, it lacks any reference to the Appellate Division's holding that the claim was
procedurally barred.

[8] The fact that the Appellate Division issued this alternative holding did not invalidate the procedural bar to this
court's consideration of the merits of defendant's claim.  See supra note 5.

particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.

Cupp v. Naughten, 414 U.S. 141, 146 (1973); see also Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (error is harmless unless it had a substantial and injurious effect on the verdict). Thus, absent a showing that the injury resulting from the trial court's jury instruction exceeded this threshold, the alleged error that Rivers highlights cannot provide the grounds for federal habeas relief.

Ultimately, the language of the jury instruction does not rise to the magnitude of unconstitutionality required to overturn a conviction. Notably, the charge tracked the language of the model criminal jury instruction on interested witnesses. See CJI2d[NY] Credibility of Witnesses—Interest/Lack of Interest. Moreover, in New York state courts, a defendant who testifies at his or her own trial is, as a matter of law, an interested witness; therefore, the trial court was not erroneous in instructing as much. See, e.g., People v. Smith, 653 N.Y.S.2d 931 (App. Div. 1997) ("[W]here, as here, the defendant testifies at trial, it is proper for the court to charge the jury that the defendant is an interested witness . . . ."); People v. Agosto, 538 N.E.2d 340, 342 (N.Y. 1989) ("There is no question that defendant was an interested witness as a matter of law . . . ."). Finally, the instruction given by the state trial court differs materially from that given in United States v. Gaines, 457 F.3d 238 (2d Cir. 2006), the primary case on which Rivers relies. In Gaines, the court condemned an instruction which explicitly stated that a testifying defendant's interest in the case created a motive to testify falsely.[9] 457 F.3d at 244. Here, on the other hand, the state court balanced its interested witness instruction by stating that

---

[9] The Gaines charge instructed, in pertinent part: "Obviously, the defendant has a deep personal interest in the result of his prosecution. This interest creates a motive for false testimony and, therefore, the defendant's testimony should be scrutinized and weighed with care." 457 F.3d at 244.

just because Rivers was, by law, an interested witness, "does not mean that [he] didn't tell you the truth." (Trial Tr. at 593.)

More importantly, evidence of Rivers's guilt at trial was overwhelming. Rivers, 916 N.Y.S.2d at 828. Thus, even assuming that the jury charge contained error, it cannot reasonably be said that such error so infected the entire trial process that the resulting conviction violated Rivers's constitutional rights. See, e.g., Nwobi v. Artuz, No. 98-CV-5036 (JG), 2001 WL 1792446, at *4 (S.D.N.Y. Nov. 27, 2001) (finding any alleged deficiencies in an interested-witness jury charge similar to that at issue here lacking "error of constitutional magnitude"). Therefore, even when considered on the merits, this aspect of Rivers's petition does not warrant federal habeas relief.

## C.     Ineffective Assistance of Counsel

Rivers next argues that his trial counsel, Adler, provided him with ineffective assistance, in violation of the Sixth Amendment as applied to the states through the Fourteenth Amendment.[10] (Pet. at 4.) Rivers asserts five grounds for his ineffective assistance of counsel claim, alleging that Adler failed and/or refused to: (1) consult or call an expert witness; (2) interview and call named witnesses; (3) offer a bank receipt as alibi evidence; (4) challenge the legality and validity of the prosecution's Exhibits Seven and Eight, the video tape and audio recordings; and (5) decline or reject the prosecution's proposed stipulation regarding the presence of another person in the building. (Id.) The New York Supreme Court held that this claim—first raised in Rivers's post-conviction motion to vacate judgment—was both

---

[10] Rivers also argues that this allegedly ineffective assistance violated the New York Constitution (Pet. at 16), but "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

procedurally barred and without merit.[11] (Decision & Order.) The court concludes that Rivers's

claim is only partially procedurally barred, but that in any event, the state court's decision was

neither contrary to, nor an unreasonable application of, clearly established federal law.

Moreover, the court finds that Rivers's claim is entirely without merit, as Adler provided

effective assistance as a matter of law. Accordingly, Rivers's ineffective assistance claim does

not warrant federal habeas relief.

>    1.    Procedural Bar

In ruling on Rivers's motion to vacate judgment, the New York Supreme Court

concluded as follows:

> The defendant contends that he was denied the effective assistance
> of counsel at trial . . . . Since [Rivers's grounds for his ineffective
> assistance claim] were readily available on the judgment appeal
> and were not raised there, the court must summarily deny this
> portion of the defendant's motion.

(Id. at 1 (citing CPL § 440.10(2)(c)).) As noted above, see supra Part II.B, this court has "an

independent duty to scrutinize" whether the state court's decision is an adequate procedural bar

to the assertion of Rivers's ineffective assistance claim. Cone, 556 U.S. at 465. The court

determines that the procedural ground on which the state court rested its decision acts as a bar to

only the latter two of the five grounds that Rivers asserts for his ineffective assistance claim.

C.P.L. § 440.10(2)(c)—the provision on which the state court based its conclusion that

Rivers's claim was procedurally barred—states:

> Notwithstanding the provisions of subdivision one, the court must
> deny a motion to vacate a judgment when . . . [a]lthough sufficient
> facts appear on the record of the proceedings underlying the
> judgment to have permitted, upon appeal from such judgment,
> adequate review of the ground or issue raised upon the motion, no

---

[11] The New York Supreme Court further observed that Rivers's counsel was an experienced criminal defense attorney who had been retained rather than appointed, and noted that Rivers first complained of his counsel's conduct six years after trial. (Decision & Order at 101-02.)

> such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him . . . .

C.P.L. § 440.10(2)(c) (emphasis added). "Section 440.10(2)(c) of [the C.P.L.] mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997). However, "'mixed claim[s] of ineffective assistance that depend[], in part, upon matters that do not appear on the record' are not 'procedurally barred' by [C.P.L.] § 440.10(2)(b) . . . ." Contant v. Sabol, 987 F. Supp. 2d 323, 351 (S.D.N.Y. 2013) (quoting People v. Maxwell, 933 N.Y.S.2d 386, 388 (App. Div. 2011)).[12] In the event that a petitioner brings a "mixed claim," the on-the-record matters are procedurally barred, but the off-the-record matters must be considered on their merits. Id.

Rivers's ineffective assistance of counsel claim is properly defined as a "mixed claim," as only the latter two grounds he asserts are borne out on the record such that they are procedurally barred pursuant to C.P.L. § 440.10.[13] The failure to object to the introduction of evidence against a defendant constitutes an on-the-record matter that falls within the purview of § 440.10's procedural bar. See Cruz v. Berbary, 456 F. Supp. 2d 410, 414 (W.D.N.Y. 2006). The same is true for the failure to decline or reject a stipulation proposed by the prosecution. See Faison v. McKinney, No. 07-CV-8561 (JGK), 2009 WL 4729931, at *13-14 (S.D.N.Y.

---

[12] "The purpose of this rule 'is to prevent [Section] 440.10 from being employed as a substitute for direct appeal when [the] defendant was in a position to raise an issue on appeal . . . or could readily have raised it on appeal but failed to do so.'" Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003) (quoting People v. Cooks, 491 N.E.2d 676, 678 (N.Y. 1986)).

[13] A petitioner's otherwise procedurally barred claims may nevertheless be heard if they can demonstrate cause for the default and prejudice arising therefrom. Murray v. Carrier, 477 U.S. 478, 496 (1986). Here, Rivers has not alleged, much less proven, these elements.

Dec. 10, 2009) (finding all of the grounds adduced on an ineffective assistance claim, including one based on counsel's failure to decline or reject the prosecution's stipulation, procedurally barred).

However, Rivers's initial three grounds asserted—namely, Adler's alleged failure to call or consult an expert, interview or call named witnesses, and offer into evidence a bank receipt germane to Rivers's proffered alibi defense—are not apparent on the the record and therefore must be determined on their merits. Contant, 987 F. Supp. 2d at 351. See, e.g., McDowell v. Heath, No. 09-CV-7887 (RO) (MHD), 2013 WL 2896992, at *5 (S.D.N.Y. Jun. 13, 2013) (ineffective assistance claim based on failure to consult an expert witness was not record-based, and, therefore, C.P.L. § 440.10 did not act as a procedural bar); Chatmon v. Mance, No. 07-CV-9655 (KMK) (GAY), 2011 WL 5023243, at *9-10 (S.D.N.Y. Oct. 20, 2011) (determining that some of petitioner's stated grounds for ineffective assistance of counsel, including counsel's alleged failure to introduce purportedly exculpatory evidence, were not procedurally barred); Bonilla v. Portuondo, No. 00-CV-2369 (JGK) (JCF), 2004 WL 350694, at *10 (S.D.N.Y. Feb. 26, 2004) ("New York courts have . . . held that a claim challenging an attorney's failure to call witnesses does not sufficiently appear on the record so as to require dismissal of that claim if raised for the first time on a § 440.10 motion.").

      2.    Merits

Ineffective assistance of counsel claims are governed by the Supreme Court's holding in Strickland v. Washington, 466 U.S. 668 (1984). See Taylor, 529 U.S. at 390. In Strickland, the Court established a two-prong test to determine whether a defendant's Sixth Amendment right to effective counsel has been violated.

First, under Strickland's "performance" prong, a petitioner must show that trial counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms." Strickland, 466 U.S. at 688. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 690). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Thus, a court must "not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside," or if the lawyer otherwise had "a reasonable justification for the decision." Greiner, 417 F.3d at 319 (internal quotation marks omitted).

Second, under Strickland's "prejudice" prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding"; rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693-94.

Establishing a claim for ineffective assistance of counsel is a "heavy burden" that, in the context of a § 2254 petition, is "enhanced by the added hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]." Eze v. Sendkowski, 321 F.3d 110, 112 (2d Cir. 2003); see also Harrington v. Richter, 562 U.S. 86, 105 (2011) ("The

standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." (internal quotation marks and citation omitted)). "[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly." Bell v. Cone, 535 U.S. 685, 699 (2002). Instead, the petitioner must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner." Id. "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

When considered on the merits, none of Rivers's five grounds for ineffective assistance of counsel provide a basis for habeas relief.

### a. *Failure to Consult or Call an Expert Witness*

Rivers contends that Adler's failure to consult an expert on arson constituted ineffective assistance of counsel. (Pet. at 21-22.) Rivers maintains that Adler could have used such an expert to cast doubt on the testimony provided by the prosecution's own expert on arson, Dolan. (Id. at 22.) While this claim is not procedurally barred, it is nevertheless without merit.

To sustain such a claim, Rivers "would have to show either (1) that trial counsel unreasonably failed to consider consulting an expert, or (2) that trial counsel did consult an expert, but did not call one, (3) that that expert was prepared to provide specific, useful testimony in support of his case, (4) that the trial court would have admitted such testimony, and (5) that the testimony likely would have affected the outcome of his trial." McDowell, 2013 WL 2896992, at *35; see also Ferrell v. United States, No. 08-CV-8245 (JGK), 2011 WL 1496339, at *4 (S.D.N.Y. Apr. 20, 2011) ("To demonstrate prejudice from counsel's alleged failure to call a witness, the petitioner must at least demonstrate that the witness was able to

testify and would have testified in a manner beneficial to the petitioner."). Indeed, to satisfy his burden, Rivers "must state exactly what testimony [the expert] would have supplied and how such testimony would have changed the result." McDowell, 2013 WL 2896992, at *35 (citing Carr v. Senkowski, No. 01-CV-689, 2007 WL 3124624, at *21 (W.D.N.Y. Oct. 23, 2007)). Mere conclusory statements about the testimonial value of uncalled witnesses are insufficient. Id. (citing Cromwell v. Keane, No. 98-CV-0013 (JSR) (AJP), 2002 WL 929536, at *24 (S.D.N.Y. May 8, 2002)).

Importantly, "[the] decision by trial counsel not to call a witness, if made for tactical reasons, usually cannot sustain an ineffectiveness of counsel claim." Akwuba v. United States, No. 02-CV-3057 (SWK) (FM), 2005 WL 2249775, at *16 (S.D.N.Y. Apr. 26, 2005); see also Stapleton v. Greiner, No. 98-CV-1971 (RR), 2000 WL 1207259, at *16 (E.D.N.Y. July 10, 2000) ("[T]he decision whether or not to call an expert witness generally falls within the wide sphere of strategic choices for which counsel will not be second-guessed on habeas review."). However, if "counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under Strickland's prejudice prong." Savinon v. Mazucca, No. 04-CV-1589 (RMB) (GWG), 2005 WL 2548032, at *33 (S.D.N.Y. Oct. 12, 2005).

Rivers fails to adequately allege ineffective assistance of counsel on this ground, as he merely claims that Adler did not consult or call an expert to testify on his behalf. Rivers alleges that Adler:

> [M]ade no investigation, namely, obtained Expert opinion(s) as to how long it would physically take for a "cigar or cigarette" placed on the [mattress], burn through, and cause the fire. [Moreover], trial counsel did not in the very least consult any Expert(s),

36

> specifically, arson, since a "timeline" was in fact, the [l]inchpin of this criminal case, as well as Defendant's whereabouts at the [exact] time the fire started. An Expert in the field of arson, would have, and could have [cast] substantial doubt that this Defendant started or even was involved the fire at 86 Himrod Street.

(Pet. at 21-22.) However, Rivers does not substantiate this allegation in any way; he offers no evidence that Adler did not consider consulting an expert, much less that such an individual could have "cast doubt" on the testimony provided by Dolan. Accordingly, Rivers's unsupported assertion that Adler was ineffective in failing to call an expert cannot sustain this portion of his habeas petition. See Kelly v. Lempke, No. 08-CV-8241 (BSJ) (RLE), 2011 WL 2227174, at *12 (S.D.N.Y. Apr. 7, 2011) (finding that petitioner had not proffered evidence to support his contention that an expert would have reached a conclusion favorable to petitioner and, accordingly, that his ineffective assistance claim was entirely speculative).

### b. Failure to Interview or Call Named Witnesses

Rivers claims that his defense counsel failed to investigate and call witnesses germane to establishing his defense. In particular, Rivers challenges Adler's decision not to call the following individuals to testify at his trial: Prescod (Pet. at 22); an individual known as "AZ" who allegedly helped extinguish the fire (id. at 23); Zakkyah McKnight, who he claims was with him on the day of the fire and could establish his alibi (id.); and four individuals who were allegedly in the building on the day of the fire: Willie Rivers, Missy Bennett, Rayshawn, and Lashell (id. at 22-23).[14] In addition, Rivers claims ineffective assistance because Elvis McKnight, who testified at trial, was not interviewed by defense counsel. (Id. at 23.) Rivers contends that these witnesses could have testified that they did not smell smoke between 9:00 a.m., when Rivers claims he left the building, and 1:45 p.m., when the fire was discovered. (Id. at 23.) Rivers maintains that some of these witnesses could have testified regarding their

---

[14] Rivers did not provide the full names of some of the individuals he claims Adler should have called as witnesses.

discovery of the fire and their attempt to extinguish it, as well as their attempts to alert others to the fire's presence. (Id.)

Courts are traditionally wary of questioning defense counsel's decisions regarding which witnesses to put before a jury. "'The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second guess,' even with respect to witnesses who 'might offer exculpatory evidence.'" Wells, 417 F.3d at 323 (quoting United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam)). "Further, '[s]uch a claim is disfavored in habeas review because allegations of what a witness would have testified are largely speculative.'" Parks v. Sheahan, --- F. Supp. 3d ---, No. 14-CV-4785 (WFK) (LB), 2015 WL 2359580, at *11 (E.D.N.Y. May 15, 2015) (quoting Speringo v. McLaughlin, 202 F. Supp. 2d 178, 192 (S.D.N.Y. 2002)).

Rivers alleges that Adler should have called seven particular witnesses to testify at trial, and that Adler should have interviewed Elvis McKnight. (Pet. at 22-23.) However, Rivers has adduced no evidence to substantiate his claim that Adler did not contact or interview any of the aforementioned individuals. Likewise, he has failed to demonstrate that Adler lacked any strategic reason for his decisions regarding which witnesses to call. For instance, Adler may have declined to call Prescod, the prosecution's confidential informant, for fear that his testimony would further harm Rivers's case. Lastly, Rivers has not shown, for example by the submission of sworn affidavits, that any of the named individuals would have been able to offer any meaningful exculpatory evidence. See Senkowski, 2007 WL 3124624, at *21 ("[A] petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have

changed the result."). In short, Rivers has failed to prove that the outcome would have been different had the above individuals testified at his trial. Consequently, this claim, though not procedurally barred, is nonetheless insufficient to support Rivers's habeas petition when assessed on the merits.

### c. Failure to Investigate and Offer Bank Receipt into Evidence

Rivers next argues that Adler was ineffective for failing to offer into evidence the bank receipt to which Rivers referred during his trial testimony. (Pet. at 22; see Def.'s Ex. I (Oziemblewski Aff., Ex. H (Dkt. 10-2)), at 97-99.) Rivers maintains that this receipt, which he produced at trial, would have corroborated his stated alibi: that at 12:24 p.m. on November 2, 2001, he was at a bank location approximately forty blocks from 86 Himrod. The Appellate Division properly concluded that this claim was both procedurally barred and entirely without merit.

As a threshold matter, the document marked as Defendant's Exhibit I does not establish Rivers's alibi as he claims it does. The document does not have a legible time or date stamp, and it does not indicate the location of the banking branch from which it was allegedly obtained. Thus, as there is little to no probative value to the document, it cannot support Rivers's ineffective assistance claim. See Smith v. McGinnis, No. 01-CV-1363 (WHP) (HBP), 2008 WL 5203726, at *5 (S.D.N.Y. Dec. 11, 2008) (in light of overwhelming evidence of defendant's guilt presented at trial, defendant failed to demonstrate that inconclusive, non-exculpatory evidence would have led to a different trial outcome; therefore, assertion that counsel should have offered evidence did not warrant habeas relief).

Moreover, under the test laid out in Strickland, a petitioner must not only show that counsel's performance was deficient but also that the deficient performance prejudiced the

39

defense, meaning that there must be a reasonable probability that, but for counsel's mistake, the outcome of the trial would have been different. Applying the Strickland standard to this case, Rivers must show a reasonable probability that, had Adler introduced the bank receipt, the jury's verdict would have been different. Rivers cannot meet this standard. At trial, the jury learned of the existence of the receipt through Rivers's testimony (Trial Tr. at 427), and Adler argued in summation that the receipt corroborated his client's alibi (id. at 544). These facts, coupled with the scant probative value of the receipt, support a finding that Adler's failure to introduce the receipt did not prejudice Rivers. See, e.g., Folk v. Philips, No. 05-CV-557 (NGG), 2007 WL 4264577, at *9 (E.D.N.Y. Nov. 30, 2007) (holding that counsel's decision not to offer as evidence a document with authenticity issues, and which supported a non-credible alibi claim, did not constitute ineffective assistance of counsel).

> ### d.  Failure to Challenge the Legality and Validity of the Prosecution's Exhibits Seven and Eight

Rivers argues that Adler was ineffective for failing to object to the admission of the audio and video recordings of his conversation with Prescod. (Pet. at 24-26.) Citing Crawford v. Washington, 541 U.S. 36 (2004), Rivers contends that this failure amounted to a violation of his Sixth Amendment right to confront the witnesses against him. Rivers's contention is misguided and without merit.

As an initial matter, Adler did, in fact, object to the admission into evidence of portions of these recordings on confrontation grounds, but the court overruled his objection. (Trial Tr. at 3-4.) Moreover, admission of the tapes into evidence did not violate Rivers's confrontation rights. In Crawford, the Supreme Court ruled that the Sixth Amendment bars the introduction of out-of-court testimonial evidence in criminal proceedings unless the declarant was unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. 541 U.S. at 68.

However, it is well-settled that recordings of statements made during conversation between a confidential informant wearing a body wire and a defendant do not qualify as "testimonial statements" under Crawford. United States v. Burden, 600 F.3d 204, 223-25 (2d Cir. 2010); see also United States v. Saget, 377 F.3d 223, 229 (2d Cir. 2004) ("[A] declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of Crawford."). Therefore, any objection by Adler that Crawford precluded the admission of the recordings would have been futile and properly denied. The decision of trial counsel not to pursue clearly futile claims cannot provide the support for a finding that he or she provided ineffective assistance. See, e.g., Williams v. United States, No. 07-CV-1804 (RJD), 2012 WL 1116403, at *14 (E.D.N.Y. Mar. 30, 2012).

   e.   *Failure to Decline or Reject the Prosecution's Proposed Stipulation*

Lastly, Rivers contends that Adler was ineffective for agreeing to stipulate that another individual, not a participant in the crime alleged, was present at 86 Himrod when the fire was set and that the circumstances were such as to render the presence of such a person inside the building a reasonable possibility. (Pet. at 26.) This contention is procedurally barred and, in any event, without merit.

Notably, Rivers himself concedes that several individuals were inside the building when the fire broke out, and in fact, he bases an element of his ineffective assistance claim on Adler's decision not to call those individuals as testimonial witnesses. (See id. at 22-23.) Thus, the presence of other individuals inside 86 Himrod at the time of the fire is undisputed. In general, stipulation to undisputed facts does not constitute ineffective assistance of counsel. See Williams v. United States, No. 13-CV-1234 (AT) (JLC), 2014 WL 1911432, at *9 (S.D.N.Y.

May 13, 2014), report and recommendation adopted in full, 2014 WL 2465202 (S.D.N.Y. Jun. 2, 2014).

Moreover, Rivers has not demonstrated that Adler lacked any strategic, or otherwise legitimate, explanation for his agreement to the stipulation. On the contrary, Adler possessed a legitimate strategic reason for doing so. As made clear at trial, the prosecution was prepared to call Prescod to testify, partially in order to establish the facts of the stipulation. Adler made the strategic decision to agree to the prosecution's stipulation in order to keep Prescod off the stand, for fear that Prescod might testify regarding Rivers's other criminal and bad acts. (See Trial Tr. at 22-29, 337-38.) "Given the high degree of deference afforded to 'reasoned decisions concerning defense strategy,' courts generally decline to second-guess an attorney's choice to stipulate." Williams, 2014 WL 1911432, at *8 (quoting Bonilla, 2010 WL 4968075, at *7).

Lastly, Rivers has not demonstrated that he was prejudiced by Adler's agreement to the stipulation. The evidence of Rivers's guilt was overwhelming. See Rivers, 916 N.Y.S.2d at 828. Rivers has not demonstrated a reasonable probability that he would have been found not guilty had Adler rejected the stipulation. As Rivers concedes, there were several people in the building when the fire broke out. (Pet. at 22-23.) Thus, had Adler rejected the stipulation, the prosecution would have had ample means by which they could have proven the stipulated facts. Accordingly, Adler's agreement to the stipulation did not constitute ineffective assistance of counsel.

### D.    Actual Innocence

Finally, Rivers claims, as he did in his motion to vacate the judgment of conviction, that he is actually innocent, and that his conviction "represents a classic case of a 'miscarriage of justice' in all respects." (Pet. at 4.) The New York Supreme Court held that this claim was

"unsupported by any evidence," and thereby rejected it on the merits. (Decision & Order.) This court agrees. As a threshold matter, this claim is not reviewable by this court, as federal courts generally do not consider freestanding claims of actual innocence. See, e.g., Jones v. Annucci, No. 14-CV-00405 (JKS), 2015 WL 5038242, at *13-14 (N.D.N.Y. Aug. 26, 2015). In any event, the claim is meritless. Accordingly, it does not provide a basis for granting Rivers habeas relief.

"[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Herrera v. Collins, 506 U.S. 390, 404 (1993); McQuiggin v. Perkins, 133 S.Ct. 1924, 1928 (2013). It is less clear whether federal habeas courts may hear "freestanding" actual innocence claims.[15] See, e.g., Annucci, 2015 WL 5038242, at *13-14; Kennard v. Connolly, No. 10-CV-1562 (JKS), 2014 WL 1028880, at *5 (N.D.N.Y. Mar. 14, 2014) (explaining that neither the Supreme Court nor the Second Circuit has issued a ruling on whether a freestanding actual innocence claim is cognizable on habeas review).

Furthermore, the Supreme Court has stated that, even assuming a freestanding claim of actual innocence were cognizable, the threshold showing of evidence would be "extraordinarily high," Herrera, 506 U.S. at 417, and indeed, would require a petitioner to exceed the Schlup standard for traditional "gateway" actual innocence claims, which requires a demonstration of

---

[15] After filing his Petition, Rivers sent a letter to the court seeking a remand of his case to the original state trial court in light of a recent New York state decision, People v. Hamilton, 979 N.Y.S.2d 97 (App. Div. 2014). (Pet'r's Ltr.) In Hamilton, the Appellate Division recognized for the first time that a freestanding claim of actual innocence is cognizable in New York state, and that such a claim would merit relief pursuant to C.P.L. § 440.10(1)(h) if established by clear and convincing evidence. 979 N.Y.S.2d at 99. Rivers contends that he is entitled to the retroactive application of Hamilton on remand because his Petition was pending when the Hamilton decision was published. However, this contention is misguided. First, the decision of a state court has no bearing on this court's resolution of the instant case. Second, in his motion to vacate the judgment of conviction, filed on February 27, 2012, Rivers brought the same claim of actual innocence asserted in the instant case; the claim was denied on the merits, and Rivers unsuccessfully appealed to the Appellate Division, thus obviating any need to remand the case for redetermination of an already-settled matter.

43

evidence such that no reasonable juror would be able to find the petitioner guilty. House v. Bell, 547 U.S. 518, 554-55 (2006) (citing Schlup v. Delo, 513 U.S. 298 (1995)).

Thus, it is not clear that this court can hear Rivers's freestanding actual innocence claim. However, assuming for the sake of argument that such a claim is cognizable, it would fail on the merits. "[A] habeas petition alleging 'actual innocence' must provide 'new reliable evidence' of innocence 'that was not presented' at trial; a petitioner's bare statement that he is innocent is insufficient." Rodriguez v. Marshall, No. 07-CV-1328, 2011 WL 2650196, at *4 (E.D.N.Y. June 29, 2011) (quoting Schlup, 513 U.S. at 324).

Rivers has neither presented, nor adequately alleged, any new evidence that would allow him to meet the high standard articulated in Schlup, much less the more stringent standard suggested by the Court in the event that freestanding actual innocence claims were cognizable in federal court. In his Petition, Rivers reasserts the same arguments that the state trial court rejected on the merits following his motion to vacate the judgment of conviction. (See Pet. at 28-30.) The bank receipt, which Rivers claims establishes his alibi (Pet. at 22), does not constitute "new evidence" for the purposes of this claim,[16] and in any event, it lacks the high exculpatory value necessary for Rivers to satisfy his substantial burden. Accordingly, even if Rivers's freestanding actual innocence claim were cognizable in this court, it would not warrant federal habeas relief.

IV.   CONCLUSION

For the reasons set forth above, Rivers's Petition for a writ of habeas corpus is DENIED. Because Rivers has not made a substantial showing of the denial of a constitutional right, no

---

[16] See Boone v. United States, No. 13-CV-8603 (JMF), 2015 WL 5139143, at *3 (S.D.N.Y. Sept. 1, 2015) (evidence known and provided to defense counsel at the time of trial was "not new evidence in any sense of the word") (quoting Roman v. United States, No. 09-CV-7942 (GEL), 2010 WL 3825737, at *2 (S.D.N.Y. Sept. 29, 2010) (Lynch, J.)).

certificate of appealability shall issue. See 28 U.S.C. § 2253(c)(2). The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and, therefore, in forma pauperis status is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 445-46 (1962). The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
December 7, 2015

NICHOLAS G. GARAUFIS
United States District Judge